# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA,

*Petitioner*,

V.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, PAUL ROBERTI, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, AND SEAN DUFFY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF TRANSPORTATION,

*Respondents*,

## PETITION FOR REVIEW

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
  *Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA MORRISON
  *Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
  *Attorneys for State of California*

January 23, 2026

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. Section 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Rule 15-1, the State of California, by and through Attorney General Rob Bonta and Office of the State Fire Marshal (OSFM), a unit of the California Department of Forestry and Fire Protection, petitions this Court for review of orders issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA), an agency within the United States Department of Transportation.

This Petition challenges three unlawful orders by PHMSA.

First, on December 17, 2025, PHMSA issued an order (the "Federalization Order") purporting to assume exclusive federal jurisdiction over the Las Flores Pipelines—a pair of onshore pipelines designated CA-324 and CA-325 that, in sequence, originate at Las Flores Canyon in Santa Barbara County, California, and terminate at the Pentland Station terminal, in Kern County, California. The assertion of federal jurisdiction is erroneous, and, if allowed to stand, would displace OSFM from its role in regulating pipeline safety for the Las Flores Pipelines. PHMSA's December 17, 2025, Federalization Order is attached to this Petition as Exhibit 1.

Second, on December 22, 2025, PHMSA issued an order approving a Restart Plan (the "Restart Approval Order") for the Las Flores Pipelines, allowing

2

them to return to service without completion of OSFM's requirements imposed pursuant to the consent decree—to which PHMSA and OSFM are signatories—after the catastrophic 2015 oil spill on these lines near Refugio State Beach, in Santa Barbara County, California. *See United States, et al. v. Plains All American Pipeline, L.P., et al.*, Case No. 2:20-cv-02415, ECF Nos. 6, 6-1, and 33 (C.D. Cal. 2020). The Restart Approval Order, if permitted to become effective, would allow the Las Flores Pipelines to operate (a) despite the failure to finish required repairs and remediation on the pipelines to address the lack of corrosion protection, which PHMSA determined to be the root cause of the Refugio Oil Spill, and (b) without complying with OSFM's alternative conditions, outlined in the OSFM State Waivers.[1] Pursuant to 49 USC § 60118(d), PHMSA did not object to granting of these waivers by OSFM for the CA-324 and CA-325 pipelines. A copy of PHMSA's Restart Approval Order is attached to this Petition as Exhibit 2.

Third, on December 23, 2025, PHMSA issued an order granting an "Emergency Special Permit" (the "Emergency Special Permit") to the Las Flores Pipelines' owner, Sable Offshore Corp., pursuant to 49 U.S.C. Section

---

[1] A State Waiver is an order that allows a state to impose additional safety requirements on a pipeline facility where continued operation would violate State or federal pipeline safety laws. Every State Waiver must be submitted to PHMSA for review; if PHMSA does not object to the terms of the order, it will issue. The State Waivers issued to Sable are available on CAL FIRE's web page Pathways for Restarting CA-324 and CA-325, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

60118(c)(2)(A), waiving compliance with federal pipeline safety regulations. The Emergency Special Permit bypassed federal procedures for approval of a special permit and lacks any legal or factual basis. PHMSA's Emergency Special Permit is attached to this Petition as Exhibit 3.

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the Pipeline Safety Act ("PSA") may be challenged by filing a Petition for Review directly in the federal court of appeals where the petitioner resides, and the petition must be filed within 89 days of the issuance of PHMSA's order. Accordingly, Petitioner has timely and properly sought review of PHMSA's orders directly in this Court.

Judicial review of PHMSA orders is conducted under the standards of Section 706 of the Administrative Procedure Act. 49 U.S.C. § 60119(a)(3). As the basis for this Petition for Review, Petitioner alleges that PHMSA's actions and orders were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

Petitioner prays for an order setting aside PHMSA's orders dated December 17, 22, and 23, 2025.

Respectfully submitted this 23rd day of January, 2026.

ROB BONTA
*Attorney General of California*

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
*Deputy Attorney General*
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3802
Email: Michael.Dorsi@doj.ca.gov
*Attorneys for State of California*

## STATEMENT OF RELATED CASES

The following related case is pending: *Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration*, Ninth Circuit Court of Appeals Case No. 25-8059.

# Exhibit 1

Exhibit 1
to Petition for Review



U.S. Department
of Transportation

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

<u>Via Electronic Mail to: cflores@sableoffshore.com</u>

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re:  Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and
operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous
Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an
interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition
regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and
903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM
pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901
and 903 were considered interstate and regulated by PHMSA. The classification change in 2016
corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy
Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets
comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the
Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable
operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the
OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review
included an on-site inspection on December 9 through December 11, 2025. OSFM
representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written
procedures and records and conducted field observations of the Las Flores facility, the pump
stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony
platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

3

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL
DAUGHERTY

Digitally signed by LINDA
GAIL DAUGHERTY
Date: 2025.12.17
07:56:55 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety

cc:     James Hosler, Chief, Pipeline Safety Division, OSFM
        Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# Exhibit 2

Exhibit 2
to Petition for Review



U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO  80228

<u>**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**</u>

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:** **Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line
CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration
(PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as
Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable
Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is
valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at
dustin.hubbard@dot.gov.

Sincerely,

DUSTIN B HUBBARD

Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:    Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
jim.hosler@fire.ca.gov

# Exhibit 3

Exhibit 3
to Petition for Review

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California.  This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days.  The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*.  PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.
[2] Sable submitted supplemental information related to its application on December 23, 2025.

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6] Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

    a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

    b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

    c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the ***special permit segments***, as follows:

    a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

    b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

    a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

    b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 4 of 16

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9) Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

    a) API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

    b) API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12)   Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13)   Pressure Testing:[11]

a)   Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

i.   All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

ii.   All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b)   Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c)   Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

i.   All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

ii.   All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d)   Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e)   Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the ***special permit segments*** that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the ***special permit segments*** cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the ***special permit segment***, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

vii. Criteria used to identify locations for excavation and field verification

viii. Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

i. Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

ii. Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

i. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

ii. USCD Performance Specification Requirements

1. The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

> ≥ 90% for axial and circumferential cracks.

    2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

    3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

    4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

    a) A crack or crack-like anomaly that meets any of the following criteria:

        i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

    a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

    a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the ***special permit segments*** is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

  i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

  ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

    ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the ***special permit segments***. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the ***special permit segments*** and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

   i.   Technical approach used for the analysis

   ii.  All data used and analyzed

   iii. Pipe and longitudinal weld seam properties

   iv.  Procedures used to implement emergency special permit conditions

v.      Evaluation methodology used

vi.     Models used

vii.    Direct in situ examination data

viii.   All in-line inspection tool assessments information evaluated

ix.     Pressure test data and results

x.      All in-the-ditch assessments performed on the *special permit segments*

xi.     All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii.    All finite element analysis results

xiii.   The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv.   The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv.    Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi.   Reassessment time interval and safety factors

xvii.  The date of the review

xviii. Confirmation of the results by qualified technical subject matter expert(s)

xix.   Approval by responsible Sable management personnel

xx.    Records of additional preventive and mitigative (P&M) measures performed

xxi.   Reports required by this emergency special permit.

24)    Reporting:

    a)  Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

    b)  An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

        i.  Tool type and run date

        ii.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

        iii. Dig sheets

        iv. Field contact information for Sable

        v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

        i. Tool type

        ii. Run date

        iii. Summary of Conditions Report[27]

        iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

        i. A Closure Report for the previous calendar (CY) which contains:

            1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

            2. Identify features that remain to be assessed

            3. Unity Plots for previous ILI runs

        ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

        iii. The third-party ILI expert reviews in accordance with condition 21(e).

        iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

        v. A copy of the CGRA for prior year including:

            1. Mean corrosion growth rate for the ***special permit segments***

            2. Distribution graph of the corrosion growth rate for the ***special permit segments*** (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

## IV. **Limitations:**

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the ***special permit segments*** to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

LINDA GAIL
DAUGHERTY

Digitally signed by
LINDA GAIL DAUGHERTY
Date: 2025.12.23
15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
    for Pipeline Safety

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2026, the foregoing Petition for Review and exhibits were served on Respondents by sending a copy via certified mail, return receipt requested, to each of the following addresses:

Paul J. Roberti, Administrator
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Office of Chief Counsel
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Pamela Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W. Washington,
D.C. 20530- 0001

Dated: January 23, 2026

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI