Nos. 25-8059, 26-508
Argument Scheduled: July 7, 2026

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA,

*Petitioner*,

V.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, ET AL.,

*Respondents*.

## REPLY TO RESPONDENT'S AND RESPONDENT-INTERVENORS' ANSWERING AND RESPONDING BRIEFS

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
  *Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA C. MORRISON
  *Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
  *Attorneys for Petitioner*

June 11, 2026

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................ 1

Argument ................................................................................... 2

I.    The Federalization order is Contrary to Law ........................... 2

    A.    The Pipeline Safety Act Does Not Include a Special Category for Midstream Processing Facilities ................ 2

    B.    Comparison Between the Definition of a "Gas Pipeline Facility" and That of a "Hazardous Liquid Pipeline Facility" Shows That the Latter Does Not Include Processing Plants Like the LFC Facilities ......... 5

    C.    The Pipeline Safety Act Does Not Define Interstate Status Based on Ownership or Operation ..................... 10

    D.    Sable's Additional Justifications Are Incorrect and Inconsistent with PHMSA's Stated Reasons for Its Order ........................................................................ 12

II.    PHMSA's Federalization Order is Arbitrary and Capricious ................................................................................ 15

    A.    PHMSA *Still* Fails to Provide a Reasoned Basis for the Federalization Order Even After It Quintupled the Size of the Administrative Record ......................... 16

    B.    PHMSA *Still* Fails to Articulate a Rational Connection between Its Findings and Its Decision ....... 20

    C.    PHMSA Impermissibly Introduced a New Justification for the Federalization Order *Post Hoc* ..... 22

III.    California Has Standing to Challenge the Restart Approval and Emergency Special Permit ................................. 27

IV.    This Court Should Vacate The Restart Approval ................... 28

    A.    The Restart Approval is an Order Pursuant to the Pipeline Safety Act and a Reviewable Final Agency Action ................................................................. 28

i

# TABLE OF CONTENTS
### (continued)

**Page**

B.      The Consent Decree is a Final Judgment That Commands Full Faith and Credit by PHMSA .............. 31

V.      The Court Should Vacate the Emergency Special Permit ...... 35

A.      The Court Has Jurisdiction to Review the Emergency Special Permit ........................................... 35

B.      PHMSA Failed to Provide a Reasoned Explanation for Issuing the Emergency Special Permit .................... 35

Conclusion ....................................................................................... 37

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Aircraft Serv. Int'l, Inc. v. FERC*
985 F.3d 1013 (D.C. Cir. 2021)..................................................................14

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*
926 F.3d 1061 (9th Cir. 2019) ...................................................................16

*Anaheim Mem'l Hosp. v. Shalala*
130 F.3d 845 (9th Cir. 1997) .....................................................................23

*Atchafalaya Basinkeeper, Inc. v. Spellmon*
No. 24-00381-BAJ-EWD, 2026 WL 917509 (M.D. La. Mar.
31, 2026) .....................................................................................................36

*Beck Park Apartments v. U.S. Dep't of Housing and Urban Dev.*
695 F.2d 366 (9th Cir. 1982) .....................................................................33

*Biden v. Texas*
597 U.S. 785 (2022).....................................................................................30

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*
419 U.S. 281 (1974).....................................................................................19

*Branham v. Montana*
996 F.3d 959 (9th Cir. 2021) .....................................................................14

*Burlington Truck Lines, Inc. v. United States*
371 U.S. 156 (1962).....................................................................................16

*CFTC v. Schor*
478 U.S. 833 (1986).......................................................................................4

*Citizens to Preserve Overton Park, Inc. v. Volpe*
401 U.S. 402 (1971).....................................................................................22

*City & Cnty. of San Francisco v. U.S. Dep't of Transp.*
796 F.3d 993 (9th Cir. 2015) .......................................................................6

# TABLE OF AUTHORITIES
## (continued)

Page

*Dep't of Commerce v. New York*
588 U.S. 752 (2019)..............................................................................15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
591 U.S. 1 (2020).................................................................12, 23, 25

*Exxon Corp. v. U.S. Sec'y of Transp.*
978 F. Supp. 946 (E.D. Wash. 1997)................................................1, 11, 26

*F.C.C. v. Fox Television Stations, Inc.*
556 U.S. 502 (2009)..........................................................................19, 22

*Flores v. Rosen*
984 F.3d 720 (9th Cir. 2020) ...............................................................33, 34

*Frontier Pipeline Co. v. FERC*
452 F.3d 774 (D.C. Cir. 2006)..............................................................14

*Hook v. State of Ariz., Dep't of Corr.*
972 F.2d 1012 (9th Cir. 1992) .............................................................32, 33

*Humane Soc'y of U.S. v. Locke*
626 F.3d 1040 (9th Cir. 2010) .............................................................25

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City
of Cleveland*
478 U.S. 501 (1986)..........................................................................32, 33

*Louisiana Power & Light Co. v. Federal Power Commission*
483 F.2d 623 (5th Cir. 1973) ...............................................................11

*Mi Familia Vota v. Fontes*
111 F.4th 976 (9th Cir. 2024) ..............................................................32

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Ins. Co.*
463 U.S. 29 (1983)..........................................................................20, 36

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*N.Y. State Dep't of L. v. FCC*
  984 F.2d 1209 (D.C. Cir. 1993).................................................................30

*Nehmer v. U.S. Dep't of Veterans Affs.*
  494 F.3d 846 (9th Cir. 2007) ...................................................................34

*New Hampshire v. Maine*
  532 U.S. 742 (2001)..................................................................................34

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*
  477 F.3d 668 (9th Cir. 2007) ...................................................................36

*Pac. Coast Fed'n of Fishermen's Associations. v. U.S. Bureau of
  Reclamation*
  426 F.3d 1082 (9th Cir. 2005) .................................................................19

*Russello v. United States*
  464 U.S. 16 (1983)..................................................................................5, 9

*Shell Oil Co. v. City of Santa Monica*
  830 F.2d 1052 (9th Cir. 1987) .................................................................14

*Southern Pacific Pipe Lines Inc. v. U.S. Dep't of Transp.*
  796 F.2d 539 (D.C. Cir. 1986)..................................................1, 10, 11, 13

*Syed v. M-I, LLC*
  853 F.3d 492 (9th Cir. 2017) .....................................................................6

*Turtle Island Restoration Network v. U.S. Dep't of Com.*
  834 F. Supp. 2d 1004 (D. Haw. 2011).......................................................30

*Turtle Island Restoration Network v. U.S. Dept. of Commerce*
  672 F.3d 1160 (9th Cir. 2012) .................................................................30

*United States, et al. v. Plains All American Pipeline, L.P., et al.*
  No. 2:20-cv-02415 (C.D. Cal.) .............................................................21, 28

# TABLE OF AUTHORITIES
## (continued)

Page

*Whitman v. Am. Trucking Associations*
531 U.S. 457 (2001)..................................................................5

*Wolverine Pipe Line Co. v. U.S. Dep't of Transp., PHMSA*
69 F.4th 365 (6th Cir. 2023) ...............................................30

**STATUTES**

5 U.S.C. § 702................................................................................30

49 U.S.C.
§ 60101(a)(8)(B) .......................................................................13
§ 60101(a)(22)(A).......................................................................7
§ 60101(a)(22)(A)(i) ..................................................................3
§ 60101(a)(22)(B)(ii) .................................................................7
§ 60102(a) .................................................................................29
§ 60105(a) ...........................................................................27, 29
§ 60112.......................................................................................27
§ 60119(a)(1) ............................................................................28
§ 60119(a)(3) ............................................................................30
§ 60502.......................................................................................14

Cal. Code Regs.
Title 14, § 1726.3.2 ..................................................................25
Title 22, § 64684 ......................................................................25
Title 23, § 2635 ........................................................................25

Cal. Gov't Code § 51010 et seq. .................................................27

Cal. Health & Saf. Code § 25270 et seq. ...................................26

**REGULATIONS**

49 C.F.R.
§ 190.341(g)...............................................................................35
§ 195.1(b)(5) .............................................................................15
§ 195.2..................................................................................8, 9, 26

## TABLE OF AUTHORITIES
### (continued)

**Page**

OTHER AUTHORITIES

50 Fed. Reg. 39,011 (1985) ..........................................................10, 11

85 Fed. Reg. 70,124 (Nov. 4, 2020)...................................................4

91 Fed. Reg. 8,949 (Feb. 24, 2026) ................................................35

91 Fed. Reg. 13,698 (Mar. 20, 2026)..............................................35

S. Rep. No. 96-182 (1979) ...............................................................6

## INTRODUCTION

Nothing in the answering briefs or PHMSA's belatedly expanded administrative record can overcome the glaring fact that PHMSA's orders violate the Administrative Procedure Act ("APA"). In PHMSA's view, because the LFC Facilities[1] provide *some* services that are *"incidental"* to transportation, that is enough to transform the sprawling complex of oil and gas treatment infrastructure into a "single, continuous, pipeline facility." No statute, regulation, or precedent supports this conclusion. And nowhere in the several iterations of the administrative record PHMSA has lodged to date is there any mention of whether this so-called "midstream processing facility" satisfies the Pipeline Safety Act's definition of a "hazardous liquid pipeline facility."

Sable's argument is even less convincing: it argues that, because it "unified" ownership of the Offshore Emulsion Pipeline, the LFC Facilities and Lines CA-324/325, and because it intended to operate them in a unified manner, it somehow transformed these three separate facilities into one. Every court to consider this argument has rejected it.[2] Nothing in the Pipeline Safety Act, PHMSA's

---

[1] Defined terms have the same meanings as California's Opening Brief.

[2] *See Southern Pacific Pipe Lines Inc. v. U.S. Dep't of Transp.*, 796 F.2d 539, 543 (D.C. Cir. 1986); *Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946, 950 (E.D. Wash. 1997).

regulations, or the case law classifies a pipeline as inter- or intra-state based on the ownership status of a pipeline and its related infrastructure.

PHMSA's Federalization Order is arbitrary and capricious, unsupported by the record, disregards a consent decree, and contradicts PHMSA's prior intrastate classification of Lines CA-324/325. Other than the barely 3-page Federalization Order itself, there is scant evidence in the record describing the investigation, if any, by which PHMSA made its determination. PHMSA directly contradicts the decision it made in 2015 that OSFM has exclusive regulatory oversight over Lines CA-324/325. PHMSA was obligated to explain its about-face. It has failed to.

This Court should grant the Petitions and vacate the Federalization Order. The Restart Approval and Emergency Special Permit should also be vacated because they rely on the Federalization Order and also violate the APA.

## ARGUMENT

**I.    THE FEDERALIZATION ORDER IS CONTRARY TO LAW**

### A.    The Pipeline Safety Act Does Not Include a Special Category for Midstream Processing Facilities

A 34-acre processing facility that separates, stores, and treats oil is not a pipeline facility, as defined by the Pipeline Safety Act, because it does not transport hazardous liquid. PHMSA's defense of its interstate classification depends on two overlapping assertions, both wrong: first, that the activities at the

2

LFC Facilities are "incidental" to the transportation of crude oil, and second, that the LFC Facilities constitute a "midstream processing facility."

PHMSA claims that the LFC Facilities are "merely a way station that is 'incidental to the movement' of the crude oil . . . ." PHMSA Br. 2 (citing 49 U.S.C. § 60101(a)(22)(A)). But the Pipeline Safety Act does not say that a facility "incidental to the movement" of oil is part of a "pipeline facility." The only place where the phrase "incidental to the movement" appears in the Pipeline Safety Act is in the definition of "transporting hazardous liquid," which states that "storage of hazardous liquid incidental to the movement of hazardous liquid" qualifies as transporting hazardous liquid. 49 U.S.C. § 60101(a)(22)(A)(i) (emphasis added).

PHMSA's own description of the LFC Facilities shows that it does more than storage. In the same paragraph calling it a way station, PHMSA discusses "the anti-corrosion and other treatments at Las Florez [sic] . . ." PHMSA Br. 2. In fact, the raw material "comes as an emulsion and leaves as a high-quality crude."[3] 1-CalFER-2. Similarly, Sable identifies the LFC Facilities as undertaking extensive separation of water, sulfur products, and other hydrocarbons, in addition to treatment and stabilization, prior to shipping crude oil by pipeline. Sable Br. 9-10, 46. Such activities are not "storage" incidental to transportation.

---

[3] This statement is by Dustin Hubbard, PHMSA's Director of the Office of Pipeline Safety – Western Region. PHMSA disclosed this document on Wednesday, June 10, 2026—the day before the deadline to file this Reply brief.

Nowhere in the administrative record is there any evidence of PHMSA considering then adopting the view that a "midstream processing facility" is included within the definition of "transportation." Instead, PHMSA points only to its proposed draft guidance issued in late 2020. PHMSA Br. 21 (citing 85 Fed. Reg. 70,125/2). PHMSA never adopted this draft guidance. There is no evidence in the record that PHMSA considered whether the LFC Facilities were midstream processing facilities before its answering brief.[4] A *draft* guidance that was never adopted, and makes no mention of the LFC Facilities, "does not represent an agency's considered interpretation of its statute." *CFTC v. Schor*, 478 U.S. 833, 845 (1986).

In short, PHMSA asks this Court to establish a "midstream processing facility" category of pipeline facility, previously unrecognized and unmentioned in any statute or regulation. Doing so would open up an enormous exception to state jurisdiction. It would take a statutorily-defined category that includes pipelines and storage tanks that are incidental to the movement of hazardous liquid and add to them treatment facilities that separate hydrocarbons, treat crude oil, and manufacture other hydrocarbons (propane, butane) which are separately taken

---

[4] PHMSA points to several of its own adjudications, all between 2009 and 2016, for support. These are not precedents, are afforded no deference, and cannot overcome the text of the statute. Notably, two of the adjudications address only jurisdiction over storage tanks—not stabilization and treatment plants. PHMSA Br. at 25-26. None affirm the redefinition of multiple facilities into one.

away by truck to be sold. *See, e.g.*, 1-CalPSE-61 ¶ 19, 2-PSE-269-270. That is not how statutory interpretation works. "Congress . . . does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). PHMSA may not read an entirely new category of facility into the Pipeline Safety Act.

**B.    Comparison Between the Definition of a "Gas Pipeline Facility" and That of a "Hazardous Liquid Pipeline Facility" Shows That the Latter Does Not Include Processing Plants Like the LFC Facilities**

As California's Opening Brief explains, the contrast between the statute's definitions of "gas pipeline facility" and "hazardous liquid pipeline facility" demonstrates that the LFC Facilities perform functions that are not performed by hazardous liquid pipeline facilities. California Br. 30-34. PHMSA argues that the contrast between the two provisions is not relevant, because Congress could have explicitly excluded treatment of hazardous liquid. PHMSA Br. 33. But the comparison with the same statute's treatment of gas is highly relevant. "'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal citation omitted). Indeed, PHMSA has successfully argued for the adoption of the same principle when considering

5

other provisions of the same statute. *City & Cnty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 999-1000 (9th Cir. 2015).

In this case, Congress intentionally *removed* the reference to treating hazardous liquid (*i.e.*, oil) from the Pipeline Safety Act's definition of a hazardous liquid pipeline facility before the Act's passage. Earlier drafts of the Hazardous Liquid Pipeline Safety Act included "treatment" as part of the activities performed by a hazardous liquid pipeline facility, but the bill was revised to remove it because industry explained that treatment is not a component of transportation. California Br. 44 n.12 (citing S. Rep. No. 96-182 at 18 (1979)).

PHMSA incorrectly construes California's argument about oil treatment as creating an "exception" to the definition of a hazardous liquid pipeline facility. PHMSA Br. 33 (citing *Syed v. M-I, LLC*, 853 F.3d 492, 501 (9th Cir. 2017)). But California does not claim that the Act contains a special exception for treatment facilities; rather, a treatment facility is not within the statutory *definition* of a hazardous liquid pipeline facility to begin with—making exceptions irrelevant. PHMSA's discussion of *Syed v. M-I, LLC*, 853 F.3d at 501-02, is thus off-point. That case discerned only the scope of an exemption from an otherwise applicable definition, not the underlying definition itself.

PHMSA and Sable note that the definition of "transporting hazardous liquid" excludes "moving hazardous liquid through . . . onshore production,

6

refining, or manufacturing." *See* PHMSA Br. 31; Sable Br. 44. They contend a "midstream processing facility" does none of those three things, so a "midstream processing facility" must be included in the definition of "hazardous liquid pipeline facility." PHMSA Br. 19-21; Sable Br. 29-30. This series of tenuous inferences fails for several reasons.

First, the exclusion in 49 U.S.C. § 60101(a)(22)(B)(ii) is not a complete list of all things that are not "transporting hazardous liquid." The listed exceptions become relevant only where something would otherwise qualify as "transporting hazardous liquid" to begin with. The definition of "transporting hazardous liquid" itself has three components: (1) movement of liquid by pipeline, (2) storage incidental to movement, and (3) movement through regulated gathering lines. 9 U.S.C. § 60101(a)(22)(A). The treatment, stabilization, and separation of propane and butane at the LFC Facilities does not meet any of these three criteria. *See* 1-CalPSE-61, 2-PSE-271–272. As a result, the Court need not consider whether the LFC Facilities fall within any of the three exceptions.

Second, the exceptions in 49 U.S.C. § 60101(a)(22)(B)(ii) specifically apply to "moving hazardous liquid through" enumerated facilities. No exemption is needed for separation, treatment, and stabilization because the equipment that performs those tasks is not "moving" hazardous liquid.

Third, the LFC Facilities do, in fact, produce, refine, and manufacture. *See* EDC Br. 33-35, California Br. 27-28. To manufacture is "to make from raw materials by hand or by machinery." EDC Br. 34 (citing dictionary definition). High-quality crude oil, also known as "treated and stabilized crude" is not a raw material—it is an output made from part of the emulsion plus other additives. *See* EDC Br. 4-5 (citing 2-PSE-269-70; 1-PSE-198; 2-PSE-373-376), 34 (citing 2-PSE-270). The LFC Facilities "manufacture" treated and stabilized crude that is later transported by pipeline, and other hydrocarbons (notably propane and butane) that are then transported by truck. PHMSA and Sable claim this is irrelevant but give no basis in statutory interpretation. PHMSA and Sable's claim concerning "refining" also misses the mark, relying on self-serving industry documents rather than generally acceptable dictionary definitions. To "refine" means "to free (something, such as metal, sugar, or oil) from impurities or unwanted material." EDC Br. 33 (citing dictionary definition). That is precisely the process that PHMSA and Sable describe: "removal of contaminants by separation or filtration." PHMSA Br. 21; Sable Br. 32.

As for "production," PHMSA relies on a definition in 49 C.F.R. § 195.2. But the definitions in PHMSA's regulations say that they are definitions for the *agency's* use of those terms in the *regulations*. PHMSA's regulations do not purport to give meaning to *Congress's* use of those terms in the *statute*. 49 C.F.R.

8

§ 195.2 (applying definitions to use of words "in this part"). In any event, PHMSA does not explain why "production" does not occur at the LFC Facilities, other than to summarily argue that the LFC Facilities "[are] not used to extract petroleum from the ground." PHMSA Br. 31. But the regulation does not limit a "production facility" to only those facilities that extract petroleum, but also those facilities that are "used in the *process* of extracting petroleum . . . and *preparing it for transportation by pipeline*," and includes the "stabilization, separation or treating of petroleum," all of which occur at the LFC Facilities.[5] *See* 49 C.F.R. § 195.2 (emphasis added).

Lastly, Sable argues that the contrast between Congress's inclusion of "processing" in the definition of "transporting gas" and omission of that term in the definition of "transporting hazardous liquid" is irrelevant because of the structural difference between subsection (a)(21) and (22). Sable Br. 47. But the definitions follow parallel structures: each first identifies what is included in subpart (A), then states what is excluded in subpart (B). This is exactly the type of comparison that the Supreme Court completed in *Russello*. *See* 464 U.S. at 23.

---

[5] The California Department of Conservation has determined that the LFC Facilities is, in fact, a production facility under California law. *See* 1-CalPSE-7, 15.

### C. The Pipeline Safety Act Does Not Define Interstate Status Based on Ownership or Operation

PHMSA and Sable contend that Sable's unified ownership of three assets—the Oil Emulsion Pipeline, the LFC Facilities, and Lines CA-324/325—justifies their classification as a single, continuous pipeline facility. PHMSA Br. 39; Sable Br. 48-49. But their theory of unified ownership and operation has no support in the Pipeline Safety Act. Neither PHMSA nor Sable points to any statute, regulation, or precedent that supports the notion that unified ownership or operation plays any role whatsoever in the jurisdictional determination of a hazardous liquid pipeline. In fact, the opposite holds true. In *Southern Pacific Pipe Lines Inc. v. U.S. Department of Transportation*, 796 F.2d 539, 541 (D.C. Cir. 1986), Southern Pacific owned oil pipeline systems containing main trunk lines that crossed into other states and lateral lines entirely within California. Southern Pacific claimed that the California lateral lines were subject to exclusive federal regulation, on the theory that "the statutory definition of interstate pipeline facilities includes all facilities used as an integral part of an interstate *system* . . . ." *Id.* at 542 (emphasis in original). The D.C. Circuit rejected this argument, noting that most intrastate pipelines connect to interstate pipelines, so relying on such connections would undermine Congress' intent, "which has always recognized a major role for the states in pipeline safety." *Id.* (quoting 50 Fed. Reg. 39,011

10

(1985)[6]); *see also* California Br. 35 (discussing *Southern Pacific*).[7] Neither PHMSA nor Sable distinguishes or even discusses *Southern Pacific*.[8]

Similarly, in *Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946 (E.D. Wash. 1997), the District Court reached the same conclusion concerning ownership, stating that "[t]he statute [the Pipeline Safety Act] says nothing about the storage facility being 'necessary' or 'integral' to operation of the pipeline . . . and nothing about the storage facility and the pipeline being owned in common." *Exxon*, 978 F. Supp. at 950. Both PHMSA and Sable rely on *Exxon Corp.* for other propositions, but avoid mentioning this discussion. PHMSA Br. 26, Sable Br. 42, 51. *Southern Pacific* and *Exxon* appear to be the only cases to consider whether common ownership is relevant to PHMSA's jurisdiction, and both held that it is not.

---

[6] 50 Fed.Reg. 39,011 (1985) goes on, "[s]tates are in the best position to assess the needs of their communities with respect to pipeline safety."

[7] Sable points to *Louisiana Power & Light Co. v. Federal Power Commission*, 483 F.2d 623 (5th Cir. 1973), for a contrary proposition. Sable Br. 53. That case does not address the extent of a "pipeline facility" under the Pipeline Safety Act; it addresses the Hinshaw Amendment to the Natural Gas Act. *Louisiana*, 483 F.2d at 632-34.

[8] This case is easier than *Southern Pacific*. Southern Pacific's lateral lines connected directly to its main trunk lines, moving the same product. Here, the offshore Oil Emulsion Pipeline connects to the LFC Facilities, where hydrocarbons are separated and treated, before a different product is delivered to Lines CA-324/325.

11

### D.    Sable's Additional Justifications Are Incorrect and Inconsistent with PHMSA's Stated Reasons for Its Order

Sable presents additional incorrect theories. Sable argues that Lines CA-324/325 are interstate because it intends to ship its oil in interstate commerce after it exits Lines CA-324/325. Sable Br. 26. Notably, Sable relies on analogies to the Federal Energy Regulatory Commission ("FERC") determinations concerning rates and PHMSA determinations concerning gas pipelines. These arguments fail for two reasons:

First, there is no evidence that PHMSA considered these arguments or the related factual questions when deciding Lines CA-324/325 are interstate pipelines. Sable relies on the "shipper's intent." Sable Br. 28, 31. But PHMSA made no reference to Sable's intent when making its jurisdictional determination.[9] Adopting Sable's views would be an impermissible *post hoc* rationalization. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020).

Second, most of Sable's arguments rely on cases applying other statutes. Sable repeatedly relies on two categories of cases: gas pipeline cases under the Pipeline Safety Act and interstate commerce cases involving FERC. These decisions address statutes with broader definitions of *inter*state and more

---

[9] PHMSA briefly suggests a similar argument in this case. PHMSA Br. 36-37. But PHMSA does not take this position in the Federalization Order. 1-CalER-25-27.

12

constrained definitions of *intra*state. Interstate commerce for hazardous liquid pipelines is determined by the location of the pipeline. *See Southern Pacific*, 796 F.2d at 541 ("lines located entirely within the state of California" were *intra*state). If an oil pipeline begins, ends, or passes through a different state (or federal zone), it is interstate, otherwise it is intrastate. *See* 49 U.S.C. § 60101(a)(8)(B); *cf.* California Br. 31-32 n.9 (comparing statutes with broader definitions of "interstate").

As explained in Part I.B, above, the provisions first enacted in the Natural Gas Pipeline Safety Act, now incorporated into the Pipeline Safety Act for gas pipelines, apply a broader definition. Unlike hazardous liquid pipelines, gas pipelines may be interstate because they "affect[] any commerce" across state lines. *See* 49 U.S.C. § 60101(a)(8)(B). Cases applying this broader gas definition simply are not applicable.

The FERC cases apply a different definition of interstate commerce because FERC performs an entirely different function by regulating rates for pipeline transportation. Consequently, Congress conferred jurisdiction on PHMSA and FERC in different statutes with different language. For purposes of FERC's jurisdiction, "interstate commerce" covers the "transportation of oil by pipeline" if the oil moves across state lines anywhere in its journey, even if some of the

13

pipelines it travels through do not cross state lines.[10] *Aircraft Serv. Int'l, Inc. v. FERC*, 985 F.3d 1013, 1017 (D.C. Cir. 2021) ("Whenever fuel crosses state lines and subsequently moves within a state by pipeline, FERC begins with the presumption that the fuel's entire journey is interstate commerce."). Thus, FERC's jurisdiction is determined by the destination of the oil, whereas PHMSA's jurisdiction is determined by the physical location of the pipeline.

Sable's argument rests on just one oil pipeline safety case: *Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1064 (9th Cir. 1987). But *Shell* did not decide whether the pipeline at issue was interstate or intrastate; rather, it "assume[d] for the purpose of summary judgment that the pipeline is intrastate." *Id*. at 1064 n.12 (noting that "the record in this case does not conclusively establish whether the pipeline is interstate or intrastate"). So, while the court noted that "the parties agree[] that whether the pipeline is interstate or intrastate in this case turns on a disputed issue of fact—the shipper's intent[,]" that phrasing makes clear that the court was simply restating the *parties'* position for purposes of summary judgment, not the Court's or PHMSA's (which was not a party to the case). *See Branham v. Montana*, 996 F.3d 959, 963 (9th Cir. 2021) ("[j]udicial assumptions concerning . . . issues that are not contested are not holdings." (citation omitted)).

---

[10] Congress conferred on FERC jurisdiction that had belonged to "the Interstate Commerce Commission on October 1, 1977." 49 U.S.C. § 60502; *see Frontier Pipeline Co. v. FERC*, 452 F.3d 774, 776 (D.C. Cir. 2006).

Last, Sable claims that in an interpretation letter concerning the THUMS inlands and the Pier J facility in Long Beach, PHMSA found that it had "jurisdiction over pipeline segments both before and after a facility performing separation of oil, gas, and water." Sable Br. 32-33. But the interpretation letter did not resolve whether the relevant pipeline facility was interstate or intrastate; it instead determined whether an exception to PHMSA's jurisdiction under 49 C.F.R. § 195.1(b)(5) applied (it did not).[11] And, contrary to Sable's implication, the pipeline downstream from Pier J is subject to *state* jurisdiction: PHMSA approved, with conditions, OSFM's State Waiver for that onshore pipeline.[12]

## II.  PHMSA'S FEDERALIZATION ORDER IS ARBITRARY AND CAPRICIOUS

"[A]gencies [must] offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). The initial administrative record failed to provide adequate justification for the Federalization Order and, even after PHMSA's repeated additions to the record, the basis for its decision remains unclear.

---

[11] *See* https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/standards-rulemaking/pipeline/interpretations/74096/thums-long-beach-company-pi-20-0008-06-08-2020-part-195-1.pdf

[12] *See* https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/standards-rulemaking/pipeline/special-permits-state-waivers/58346/2018-0017-lod-grant-state-ca-thums-crc.pdf

### A. PHMSA *Still* Fails to Provide a Reasoned Basis for the Federalization Order Even After It Quintupled the Size of the Administrative Record

Reasoned decision-making is the touchstone of arbitrary and capricious review. *See Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019). PHMSA's failures to provide an administrative record in this case have been extraordinary, and its belated additions to the certified record still fail to illuminate its decision-making process. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (reasoned decision-making requires that "[t]he agency must make findings that support its decision, and those findings must be supported by substantial evidence").

Petitioner Environmental Defense Center filed its petition on December 24, 2025, and PHMSA filed its certified index on January 13, 2026. Case No. 25-8059, Dkt. 1, 25 (hereafter, "EDC Dkt."). California filed its petition on January 23, 2026, and PHMSA filed its amended certification on March 5, identifying the same record it certified in case no. 25-8059. Case No. 26-508, Dkt. 1, 18 (hereafter, "California Dkt."). The original certified record totaled just 53 documents and 1,429 pages.

Included in the original record were just 12 documents PHMSA identified as related to its "Interstate Designation and Restart Plan Approval." *See* EDC Dkt. 25 at 8-10. Of these 12 documents, only 2 documents—Sable's interstate

16

determination letter to PHMSA and the Federalization Order itself—reference PHMSA's interstate determination, with the remainder relating to the Restart Approval. *See id.* This is not the transparent and reasoned decision-making process required by the APA.

Both petitioners filed their opening briefs on March 23, and moved to correct or augment the administrative record. California Dkt. 23, 26; EDC Dkt. 53, 56. In its motion, California identified four documents for inclusion but also noted that the record (1) lacked the documentation used to generate an "Inspection Output Report," 2-CalER-29-31, and (2) was completely devoid of "notes or reports" from PHMSA's inspections of Sable's various assets. California Dkt. 26 at 11. In response, PHMSA conceded that all four documents identified by California and two documents identified by the environmental petitioners should have been in the administrative record. California Dkt. 35 at 2. PHMSA also offered one additional document—1 USSER-0147-66—but ignored California's suggestion that there were additional missing inspection documents and reports. California Dkt. 35 at 2-3.

On May 1, PHMSA requested a 12-day extension of time to file its answering brief because it had located "more than 2500 hundred [sic] pages of information which are part of the administrative record." California Dkt. 45 at 1. The Court granted PHMSA a 3-day extension of time, through May 11. California Dkt. 48.

On May 9, PHMSA filed its second revised certified index. California Dkt. 49. The index identified 104 additional documents, consisting of 5,620 additional pages (not 2,500), more than quadrupling the size of the original record. *Id.* On May 11 and 12, PHMSA and Sable filed their answering and responding briefs. California Dkt. 50, 52.

Contained within the new tranche of record documents are inspection reports, technical plans, and oil spill contingency plans—the very documents that California advised PHMSA were missing from its original record. However, the record still contained no documents describing the process PHMSA undertook, or the pipeline infrastructure PHMSA inspected, to make its interstate determination. Other than the three-page Federalization Order itself, 1-CalER-25-27, and Sable's letter to PHMSA, 2-CalER-208-211, the revised record was still devoid of evidence of PHMSA's decision-making process—no notes, records, reports or communications.

On May 26, this Court directed PHMSA to file a *third* certified index and complete the administrative record with documents directly or indirectly considered by PHMSA, "including internal communications; communications with federal, state, or local agencies; communications with Intervenors; [and] reports or memoranda of inspections referenced in PHMSA's [Federalization Order]." California Dkt. 68. In other words, the same evidence that California had been

18

asking PHMSA for since March. On June 9, PHMSA filed its third certified index, identifying an additional 55 documents, comprising 1132 pages, and bringing the total record to 8278 pages, more than quintupling its original size. California Dkt. 89. On June 10, *one day* before petitioners' reply brief deadline, PHMSA delivered the additional documents.

While courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (citation omitted), here, the Court cannot infer agency reasoning from silence. *See Pac. Coast Fed'n of Fishermen's Associations. v. U.S. Bureau of Reclamation,* 426 F.3d 1082, 1091 (9th Cir. 2005) (agency could not "implicitly" conclude anything without articulating a basis for its conclusion, since that "would reject the bedrock concept of record review." (citation and quotation marks omitted)). Further, because PHMSA has "chang[ed] [its] position"—from declaring Lines CA-324/325 intrastate in 2016 to now declaring them interstate—it was required to state "good reasons for the new policy," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," *id.* at 516; *see also* 5-CalER-899-901 (2016 Letter Agreement). PHMSA did not do so when it issued its

19

perfunctory Federalization Order, and it still has not done so now, despite repeated additions to the record.

In ostensible recognition of the deficiencies in the record, PHMSA offers to further bolster the record *if the Court so requests*. PHMSA Br. 60 ("PHMSA can develop a robust record to respond to the Court's concerns."). PHMSA's offer to "[r]educ[e] additional aspects of PHMSA's consideration to written documents that can be produced in an administrative record," California Br. 61, is similarly inadequate. Under the APA, justifications must appear *in the record itself*—not in agency makers' heads, to be later "reduc[ed]" to writing upon court request. PHMSA may be able to undertake a new decisionmaking process and try to get it right. But in the meantime, the Federalization Order should be vacated

### B. PHMSA *Still* Fails to Articulate a Rational Connection between Its Findings and Its Decision

Not only is PHMSA's newly added evidence unenlightening, it does not link PHMSA's findings to the Federalization Order. An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983) (citation and quotation marks omitted). The one report that alleges its purpose is "for a jurisdictional analysis of the onshore portion of the pipeline," 3-USSER-689, does not show how the facts found answer the jurisdictional question. Instead, the report consists of responses

20

to 138 questions, *all* of which relate to pipeline safety and *none* to PHMSA's interstate determination.[13] Neither the report, the Federalization Order, nor any other record document describes the jurisdictional review cited in the report.[14] The conclusion is clear after repeated redoubling of the record: the documents describing PHMSA's interstate determination simply do not exist *because PHMSA never undertook that analysis*.

PHMSA unilateral alteration of the jurisdictional boundary of Lines CA-324/325 also lacks a reasoned explanation. PHMSA argues that the pipeline "is an interstate hazardous liquid pipeline facility because 'it transports crude oil from the [Outer Continental Shelf] to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from the Las Flores Canyon facility to Pentland, California.'" PHMSA Br. 18-19 (citing 1-ER-26). But this is a legal argument that elides PHMSA's strained definition of a hazardous liquid pipeline facility. Lines CA-324/235 have *always* transported crude oil that originated from the Outer Continental Shelf. The only thing that has changed, according to PHMSA, is that Sable now owns and operates "the Las Flores Pipeline assets as a

---

[13] The questions that went into the report were finally revealed in the third certified index, and they all relate to safety. *See* 1-CalFER-3, linking to https://www.phmsa.dot.gov/forms/phmsa-hazardous-liquid-ia-question-set.

[14] For example, the Federalization Order simply states, in conclusory fashion, that PHMSA "conducted field observations of the Las Flores facility." 1-CalER-25.

single pipeline system." 1-CalER-25. But neither Sable nor PHMSA offers any authority for the proposition that ownership is relevant to defining the boundaries of a "facility." 2-CalER-209-10. And while PHMSA's answering brief concludes that, "the record here establishes that the Las Flores Canyon facility serves important transportation related functions and is part of a single interstate pipeline system," PHMSA Br. at 19, PHMSA makes *no citation to the record* to support that assertion.

Indeed, there is nothing in the record to support this new jurisdictional boundary, and certainly not the "more detailed justification" that is required when "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 515-16. The lack of explanation or support for the Federalization Order in PHMSA's record demonstrates the Order was predetermined.[15]

### C. PHMSA Impermissibly Introduced a New Justification for the Federalization Order *Post Hoc*

Judicial review must be based on the full administrative record that was before the agency at the time it made its decision. *See Citizens to Preserve Overton*

---

[15] By PHMSA's own admission, the Federalization Order was a rushed decision. *See* 1-CalFER-2("this is a unique inspection with a quick turnaround and needs to be completed quickly"); *see also* 1-CalFER-5(Sable email requesting a meeting with PHMSA due to "significant challenges" restoring pipeline operations). What remains obscured is the reason for a "quick turnaround" and on whose direction.

*Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Courts may not consider *post hoc* rationalizations for agency action, whether articulated after-the-fact in court proceedings or in belated agency explanations. *Dep't of Homeland Sec.,* 591 U.S. at 21. An agency may "provide an 'amplified articulation' of a prior 'conclusory' observation," as long as its explanation is "limited to the agency's original reasons." *Id.* at 20-21 (citation omitted). What PHMSA does now goes far beyond that.

In its answering brief, PHMSA introduces a new justification for re-designating Lines CA-324/325 as interstate: that following the pipelines' shutdown in 2015, Plains cancelled its FERC tariff because "transportation service was no longer available in interstate commerce," but that "[i]n December of 2025, Sable informed PHMSA that it intended to operate an interstate pipeline." PHMSA Br. 36; *see also* Sable Br. 16-17. In other words, PHMSA appears to suggest that the only reason it agreed to the pipelines' intrastate designation in 2016 was that the pipeline was shut down and not transporting oil at the time. *See* PHMSA Br. 41 ("California would act as regulator over CA-324/325 at a time when no FERC tariff applied, and there was no oil flowing through the pipeline").

PHMSA does not point to anywhere in the administrative record where the agency relied on or even considered this as a basis for its action. *See Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997) ("an agency's decision

23

can be upheld only on the basis of the reasoning in that decision." (citation omitted)). And the action makes no sense, because it would mean that, despite the Consent Decree vesting OSFM with exclusive regulatory jurisdiction over the pipelines' restart, OSFM's jurisdiction would end the moment the pipeline owner (Sable) applied to restart the pipelines.

Equally specious is PHMSA's suggestion that re-designating the pipelines as interstate is simply restoring jurisdiction to the *status quo ante*. *See, e.g.,* PHMSA Br. 36 ("PHMSA's assertion of jurisdiction is consistent with its past practice and is not a 'new policy.'"). As Sable concedes, the pipelines were previously designated interstate only based on a planned connection to Texas, *not* because they transported oil from the Outer Continental Shelf. *See* Sable Br. 38 ("Before 2000, Plains operated segments CA-324 and CA-325 as part of an integrated pipeline system transporting crude oil from California to Texas."). And the interstate pipeline at that point did not pass through the LFC Facilities; instead, it started at LFC and then went to Texas. PHMSA is thus attempting to fundamentally transform the boundaries of the "interstate pipeline facility"—from a Las Flores Canyon-to-Texas pipeline prior to 2000, to an Outer Continental Shelf-to-Kern County pipeline now. But nothing in the record supports this significant transformation. In any event, this explanation appears nowhere in any of the several versions of the administrative record that PHMSA has presented, and

24

respondents cannot rely on it. *See Regents*, 591 U.S. at 23 ("Permitting agencies to invoke belated justifications . . . can upset the orderly functioning of the process of review, forcing both litigants and courts to chase a moving target." (citation and quotation marks omitted)).

Other record evidence cited by PHMSA is similarly *post hoc* rationalization for its decision and appears mostly anecdotal. Since there is nothing that actually evidences any jurisdictional review by PHMSA, PHMSA cites to various plans and reports for evidence that, for instance, crude oil undergoes anti-corrosion treatment and inspection at the LFC Facilities. *See, e.g.*, PHMSA Br. 28. But the Federalization Order did not rely on these documents at all—or even mention them. They cannot be regarded as part of the basis for the decision that was made. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010) ("[P]ost hoc explanations serve to only underscore the absence of an adequate explanation in the administrative record itself."). In any event, anti-corrosion treatment is not conclusive evidence of a hazardous liquid pipeline facility, as many state laws require anti-corrosion monitoring and mitigation in, for example, underground storage tanks (Cal. Code Regs. Tit. 23, § 2635), gas storage wells (Cal. Code Regs. Tit. 14, § 1726.3.2), and drinking water systems (Cal. Code Regs. Tit. 22, § 64684).

PHMSA cites to *Exxon Corp. v. U.S. Secretary of Transp.*, 978 F. Supp. 946 (E.D. WA 1997), and two PHMSA administrative enforcement cases, for its position that the LFC Facilities' two 11.3 million gallon storage tanks facilitate transportation. *See* PHMSA Br. 24-27. At issue in *Exxon* and the administrative cases was whether the storage facilities in those cases were governed by the federal Pipeline Safety Act and PHMSA's regulations. *See, e.g.*, *Exxon*, 978 F. Supp. at 949. Here, however, the LFC Facilities' storage tanks are regulated by the County of Santa Barbara, not PHMSA, under California's Aboveground Petroleum Storage Act ("APSA"), Health and Safety Code section 25270 et seq. *See* 1-CalPSE-6 ("during its entire operational history, Santa Barbara County, acting as the [Unified Program Agency], has exercised regulatory jurisdiction over LFC as a tank facility subject to the APSA"); *see also* 1-CalPSE-9 ("LFC has been historically regulated under the jurisdiction of Santa Barbara"); 1-CalPSE-10 (same). In addition, Sable admitted the storage tanks are *not* "breakout tanks," 1-CalFER-4—but now argues they are without any citation to the record. Sable Br. 10.[16] To the extent that PHMSA now purports to assert jurisdiction over the LFC Facilities, it is nowhere

---

[16] "Breakout tanks" are defined as tanks used to "receive and store hazardous liquid transported by a pipeline for reinjection and *continued transportation by pipeline*." 49 CFR § 195.2 (emphasis added).

in the administrative record.[17] Accordingly, the Federalization Order is arbitrary and capricious.

### III. CALIFORNIA HAS STANDING TO CHALLENGE THE RESTART APPROVAL AND EMERGENCY SPECIAL PERMIT

Although PHMSA did not assert any challenges to California's standing, Sable makes a half-hearted attempt vis-a-vis the Restart Approval and Emergency Special Permit. Sable Br. 58-60. Sable recognizes California has a sovereign interest in the continued enforceability of its statute, which is sufficient to establish standing, but claims that only the Federalization Order inflicts such harm. Sable Br. 60. Sable is wrong. California also has the sovereign interests of having "the sole regulatory oversight" of review and approval of any restart plan pursuant to the Consent Decree as well as enforcing its own pipeline safety laws as provided by the Pipeline Safety Act, 49 U.S.C. § 60105(a), and the State's analog, the Elder California Pipeline Safety Act of 1981. Cal. Gov't Code § 51010 et seq. PHMSA's unlawful usurpation of California's oversight of restart plans is directly traceable to

---

[17] Although PHMSA cites to certain record documents as evidence that it has exercised intermittent regulatory oversight at the LFC Facilities, that was as a result of the Refugio Oil Spill when it issued a "corrective action order" shutting down the pipelines, as well as the LFC pumps. PHMSA Br. 37-38 (citing 1-USSER-6-8, 3-ER-381). But PHMSA has broad authority to issue a "corrective action order" to address a threat to life, property or the environment. 49 U.S.C. § 60112.

the Restart Approval itself and vacatur of this order would restore California's proper role.

California has standing to challenge the Emergency Special Permit for similar reasons. OSFM is the party that has the regulatory authority to waive compliance with any pipeline safety measure for Lines CA-324/325 through State Waivers. 5-CalER-865. California's sovereign interest to issue or deny State Waivers is harmed by PHMSA's issuance of the Emergency Special Permit or its renewal.

## IV. THIS COURT SHOULD VACATE THE RESTART APPROVAL

### A. The Restart Approval is an Order Pursuant to the Pipeline Safety Act and a Reviewable Final Agency Action

This Court has jurisdiction to review the Restart Approval because it is an "order" under 49 U.S.C. § 60119(a)(1) and a "final agency action" under the APA.

Sable argues that the Restart Approval must be reviewed by the District Court because "[i]t arises solely from PHMSA's implementation of a judicially-entered Consent Decree and has no independent legal basis." Sable Br. 57. This position is exactly the opposite of what Sable argued in *United States, et al. v. Plains All American Pipeline, L.P., et al.*, No. 2:20-cv-02415 (C.D. Cal.) ("*Plains*").[18] And it

---

[18] In *Plains*, PHMSA and Sable argued that the Restart Approval is reviewable only in the Ninth Circuit, not in the District Court. *Plains*, ECF 60 at 24 ("California is already challenging PHMSA's decision in the Ninth Circuit and the Secretary's order in a separate action before this Court. [citations] Those are the proper venues to litigate those decisions—not here.) As of this filing, the motions in the District Court remain unresolved.

is wrong. PHMSA is not "implement[ing]" the Consent Decree through issuance of the Restart Approval, it is circumventing it. Moreover, the Restart Approval violates the Pipeline Safety Act independent of the Consent Decree by purportedly authorizing the restart of Lines CA-324/325 even though the Act vests that authority in OSFM. *See* 49 U.S.C. § 60105(a).

The requirement for OSFM to review and approve restart plans for Lines CA-324/325 is part of Appendix D of the Consent Decree, which comprises outstanding terms and conditions of a prior Corrective Action Order ("CAO") *issued by PHMSA* pursuant to its authority under the Pipeline Safety Act. *See* 5-CalER-790, 800, 816. Additionally, the requirement to review and approve restart plans is a pipeline safety measure, which the Pipeline Safety Act governs. 49 U.S.C. § 60102(a).

The CAO directed the then operator Plains to keep sections of Lines CA-324/325 "shut down until the actions required by the PHMSA CAO were satisfactorily completed." *Id.* As part of the Consent Decree, the District Court merged all outstanding terms and conditions of the CAO into Appendix D. 5-CalER-816. Appendix D lists various pipeline safety measures, provides that the outstanding corrective actions are "subject to the sole regulatory oversight of the OSFM," and provides that OSFM will review and approve restart plans for Lines CA-324/325 prior to their restart. 5-CalER-880-887.

29

Despite these explicit directions, PHMSA issued the Restart Approval usurping OSFM's agreed upon role as sole regulator of pipeline safety for Lines CA-324/325. As a result, OSFM and California have been adversely affected by the Restart Approval, and this Court is authorized to review it under the APA. *See* 49 U.S.C. § 60119(a)(3); *Wolverine Pipe Line Co. v. U.S. Dep't of Transp., PHMSA*, 69 F.4th 365 (6th Cir. 2023) (reviewing order finding pipeline company liable for violating pipeline safety regulations and assessing penalties.)

The APA grants the right of judicial review of final agency action. 5 U.S.C. § 702; *Biden v. Texas*, 597 U.S. 785, 788 (2022). The Restart Approval is a final agency action because it is the consummation of PHMSA's review and approval of Sable's restart plan and authorizes Sable to return Lines CA-324/325 to service. *Compare* 1-CalER-22 (PHMSA assertion of jurisdiction), *with* 5-CalER-881 (Consent Decree assigning restart approval to OSFM).

Sable argues, in part, that the Restart Approval is not subject to APA review because "[a] consent decree is a judicial act, rather than an agency act," citing to *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 834 F. Supp. 2d 1004, 1013-14 (D. Haw. 2011), *aff'd*, 672 F.3d 1160 (9th Cir. 2012). Sable Br. 57. However, *Turtle Island* concerns the District Court's adoption of a consent decree, not an agency action taken pursuant to a consent decree's requirements. 672 F.3d at 1162. Sable cites *N.Y. State Dep't of L. v. FCC*, 984 F.2d 1209, 1214-15 (D.C.

30

Cir. 1993) to argue that PHMSA's decision to enter into the Consent Decree is also unreviewable. Sable Br. 57-58. But just like California did not petition this Court to review the Consent Decree, it also did not petition this Court to review PHMSA's decision to enter into the Consent Decree. Instead, California asks this Court to review the Restart Approval, a final agency action taken by PHMSA.

Sable and PHMSA also attempt to evade this Court's review by contending that the Court lacks jurisdiction because "[a]s a challenge to a Consent Decree requirement," the Consent Decree provides for a dispute resolution mechanism. Sable Br. 58; *see also* PHMSA Br. 57. Sable and PHMSA misconstrue California's challenge. California does not challenge a Consent Decree requirement or the Consent Decree itself. Instead, California asserts that the Consent Decree is still a valid and enforceable judgment as there is no evidence that it has been terminated. In light of this background and PHMSA's agreement to the terms of the Consent Decree, California seeks this Court's determination as to whether PHMSA's Restart Approval violates the APA.

## B. The Consent Decree is a Final Judgment That Commands Full Faith and Credit by PHMSA

Sable argues that the Restart Approval is not reviewable or subject to the APA because it is a contract embodied in a consent decree. Sable Br. 57. Treating the Consent Decree as merely a contract as well, PHMSA argues that "the consent decree could not contractually create or convey state regulatory authority," and

federal regulatory authority cannot be extinguished through a contract. PHMSA Br. 40. Both Sable and PHMSA ignore that the Consent Decree is a final judgment that binds the parties, *see Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1017 (9th Cir. 1992), and that may not be "revised, overturned or refused faith and credit by another Department of Government," *Mi Familia Vota v. Fontes*, 111 F.4th 976, 982 (9th Cir. 2024) (quotations omitted). While it is true that consent decrees can be labeled "contracts," they remain judgments as well. *See Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 519 (1986). The Consent Decree remains valid and enforceable unless and until it is modified or terminated by the court itself.

In October 2020, when the District Court entered the Consent Decree, there was no dispute that California had regulatory oversight over the review and approval of any restart plan of Lines CA-324/325. Indeed, the lines had been deemed intrastate in 2016, four years prior. 5-CalER-899-901. PHMSA and Sable argue that the facts that surrounded the designation of Lines CA-324/325 "no longer exist," Sable Br. 1, that "the consent decree could not contractually create or convey state regulatory authority," and that federal regulatory authority cannot be contractually extinguished. PHMSA Br. 40. California disputes that the facts surrounding Lines CA-324/325's status as intrastate have changed, but even if they had, PHMSA cannot usurp OSFM's oversight responsibilities by unilaterally

32

changing the obligations created by the parties to the Consent Decree. *Flores v. Rosen,* 984 F.3d 720, 741 (9th Cir. 2020) ("We reject the notion that the executive branch of the government can unilaterally create the change in law that it then offers as the reason it should be excused from compliance with a consent decree."); *see also Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d at 1017 (noting that a government agency cannot simply ignore a consent decree without following the proper procedure to obtain relief).

PHMSA proclaims that Lines CA-324/325 are now suddenly part of a "single pipeline system" and that the only way the Consent Decree can convey regulatory authority to California is through delegation of PHMSA's statutory authority. PHMSA Br. 40. PHMSA relies on *Beck Park Apartments v. U.S. Dep't of Housing and Urban Dev.*, 695 F.2d 366 (9th Cir. 1982), which is inapplicable. PHMSA Br. 40-41. *Beck Park Apartments* considered the issue of HUD's ability to surrender its regulatory authority over rent adjustments through a contract—not a consent judgment—with a private entity. 695 F.2d at 369. Unlike in *Beck Park Apartments,* OSFM is not a private entity but a state agency with the statutory authority to regulate intrastate pipelines. Moreover, *Beck Park Apartments* held that HUD did *not* surrender its regulatory authority as PHMSA implies. *Id.* at 371.

As a contract, the Consent Decree still binds PHMSA and Sable. As a co-plaintiff, PHMSA agreed to be bound by its terms. *See Loc. No. 93, Int'l Ass'n of*

33

*Firefighters*, 478 U.S. at 522. By entering into an Assumption Agreement (3-CalER-561-68) as well as being an assignee of the former operator (5-CalER-796), Sable is also bound by the Consent Decree's terms and obligations. To allow PHMSA to unilaterally decree that Lines CA-324/325 are now interstate pipelines without the consent of all contracting parties would undermine the integrity of the judicial process. Specifically, the district court's power to enter and enforce a consent decree would be severely frustrated. The erosion of the judicial process is exactly what the doctrines of judicial estoppel and claim preclusion are meant to protect against. *New Hampshire v. Maine,* 532 U.S. 742, 750 (2001).

If the facts had truly changed and Lines CA-324/325 were part of an interstate pipeline system, PHMSA should have sought and obtained modification or termination of the Consent Decree from the District Court. Under this Circuit's precedent, a federal agency may not issue decisions contrary to a consent decree to manufacture changed circumstances, or even to divest the district court of jurisdiction. *Flores*, 984 F.3d at 741; s*ee Nehmer v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 860 (9th Cir. 2007). Since PHMSA and Sable did not seek and obtain modification or termination of the Consent Decree from the District Court at the time that PHMSA issued the Restart Approval, OSFM retained regulatory oversight and the PHMSA orders are contrary to law.

34

## V. THE COURT SHOULD VACATE THE EMERGENCY SPECIAL PERMIT

### A. The Court Has Jurisdiction to Review the Emergency Special Permit

California's challenge of the Emergency Special Permit ("ESP") is not moot. A continuing consequence of PHMSA's grant of the ESP is that Sable may apply for renewal. 49 C.F.R. § 190.341(g). While Sable applied for a non-emergency Special Permit, PHMSA has not published a determination on Sable's application, and it has given no indication when or if it will make such a determination. *See* Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable), 91 Fed. Reg. 8,949 (Feb. 24, 2026); 91 Fed. Reg. 13,698 (Mar. 20, 2026). In the meantime, the possibility of Sable applying for, and PHMSA granting, a renewal remains. If this Court vacates the ESP, Sable will no longer be able to apply for renewal. Instead, Sable will need to re-apply for State Waivers from OSFM as required by the Consent Decree. 5-CalER-865.

### B. PHMSA Failed to Provide a Reasoned Explanation for Issuing the Emergency Special Permit

PHMSA fails to convincingly rebut California's argument that PHMSA failed to provide a reasoned explanation in the record for how the ESP addressed an emergency. *See* California Br. 59-61. PHMSA's brief points to Executive Order 14156 and Sable's application materials. PHMSA Br. 54. But PHMSA shows nowhere in the record where PHMSA itself even considered—let alone sufficiently explained—how the granting of the ESP enabled and facilitated, reduced,

35

mitigated, or met any of the purported needs listed in its Special Permit Analysis and Findings. It simply directs the reader to Sable's application materials in the ESP. *See* 1-CalER-4. But this is not enough. *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689-90 (9th Cir. 2007) (agency's "bald[]" assertions that it took action to comply with its statutory mandate was insufficient). PHMSA failed to provide "a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *See State Farm*, 463 U.S. at 43 (citations omitted).

PHMSA provides scant reasoning for its issuance of a special permit on an emergency basis. PHMSA makes no indication that it examined any data, considered any factors, or had a basis to conclude that the granting of the ESP would indeed address the "emergency." All PHMSA says in the ESP and Statement of Analysis and Findings is that Sable stated the granting of the special permit would provide relief in response to the "acute energy shortage[s]" and points the reader to Sable's application materials and EO 14156. *See* 1-CalER-4; 1-CalER-20; *see also Atchafalaya Basinkeeper, Inc. v. Spellmon*, No. 24-00381-BAJ-EWD, 2026 WL 917509, at *9, *13-14 (M.D. La. Mar. 31, 2026) (agency cannot "cop[y] and past[e]" or "rubber stamp" a statement made by others). Rather than provide a reasoned explanation in its Statement of Analysis and Findings,

36

PHMSA does nothing more than provide a few conclusory statements, which are insufficient.

## CONCLUSION

The Court should grant the petition and vacate the Federalization Order, Restart Approval, and Emergency Special Permit.

Dated: June 11, 2026          Respectfully submitted,

/s/ Michael Dorsi

MICHAEL DORSI
  *Deputy Attorney General*
ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
  *Senior Assistant Attorney General*
DEBORAH M. SMITH
  *Acting Senior Assistant Attorney General*
MYUNG J. PARK
VANESSA C. MORRISON
  *Supervising Deputy Attorneys General*
MATTHEW BULLOCK
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
  *Deputy Attorneys General*

37

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8059, 26-508

I am the attorney or self-represented party.

**This brief contains 8,382 words,** including zero words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[x] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [x] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Michael Dorsi*        **Date:** June 11, 2026

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** 25-8059, 26-508

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[x] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

REPLY TO RESPONDENT'S AND RESPONDENT-INTERVENORS' ANSWERING AND RESPONDING BRIEFS

**Signature**    *s/ Michael Dorsi*    **Date**    June 11, 2026

SA2026300092 2026-06-11 CA v PHMSA Reply Brief.docx